Page 2

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District | KANSAS |
|---|---|---|

| Name (under which you were convicted):<br>John Ross Stenberg | Docket or Case No.:<br>22-3308-JWL-JPO |
|---|---|

| Place of Confinement:<br>Ellsworth Correctional Facility | Prisoner No.:<br>KDOC 0113332 |
|---|---|

| Petitioner (include the name under which you were convicted)<br>John Ross Stenberg     v. | Respondent (authorized person having custody of petitioner)<br>Donald Langford |
|---|---|

| The Attorney General of the State of<br>                  KANSAS | |
|---|---|

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: District
Court of Gray County, Kansas

   (b) Criminal docket or case number (if you know): 14 CR 170

2. (a) Date of the judgment of conviction (if you know): _____
   (b) Date of sentencing: 4/5/16

3. Length of sentence: Life with no possi bility of parole for 25 years

4. In this case, were you convicted on more than one count or of more than one crime?   Yes ☒   No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: _____
   1 count Rape K.S.A. 21-5503(a)(3)
   2 counts Aggravated Criminal Sodomy K.S.A. 21-5504(b)(1)
   1 count Aggravated Indecent Liberties K.S.A. 21-5506(b)(3)(A)

6. (a) What was your plea? (Check one)
   (1) Not guilty ☒         (3) Nolo contendere (no contest) ☐
   (2) Guilty ☐             (4) Insanity plea ☐

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?   N/A

_____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury    _X_              Judge only    ____

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes  _X_         No ____

8. Did you appeal from the judgment of conviction?

Yes  _X_         No ____

9. If you did appeal, answer the following:

(a) Name of court: Court of Appeals of the State of Kansas

(b) Docket or case number (if you know): 16-116026-A

(c) Result: Affirmed

(d) Date of result (if you know): 10/06/2017

(e) Citation to the case (if you know): 404 P.3d 356

(f) Grounds raised: (1) The District Court erred in denying Mr. Stenberg's motion to suppress.

(2) The Distric Court committed reversibe error in failing to instruct the jury on the lesser included offense of attempted rape.

(3) The Distric Court erred in imposing lifetime post-release supervision.

_____

_____

(g) Did you seek further review by a higher state court?    Yes  _X_         No ____

If yes, answer the following:

(1) Name of court: Supreme jCourt of Kansas

(2) Docket or case number (if you know): 16-116026-A

(3) Result: Denied

_____

(4) Date of result(if you know): 04/27/2018

(5) Citation to the case (if you know): State v. Stenberg

(6) Grounds raised: (1) The District Court erred in denying Mr. Stenberg's motion to suppress.

(2) The Distric Court committed reversibe error in failing to instruct the jury on the lesser included offense of attempted rape.

(b) Did you file a Petition for Certiorari in the United States Supreme Court?     Yes ____   No ___X___

If yes, answer the following:

(1) Docket or case number (if you know): __N/A__

(2) Result: __N/A__

(3) Date fo result (if you know): __N/A__

(4) Citation to the case (if you know): __N/A__

10, Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgement in any state court?

Yes ___X___   No ____

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: __Gray County District Court__

(2) Docket or case number (if you know): __2019-CV-000004__

(3) Date of filing (if you know): __03/05/2019__

(4) Nature of the proceeding: __Pesons in Custody,    K.S.A 60-1507__

(5) Grounds raise: __(a) Ineffective Assistance of Trial Counsel...__

_____(b) Ineffective Assistance of Appellate Counsel...__

_____(c) Denied due process under the Fifth Amendment to the Constitution of the United States.__

_____(d) Denied the Sixth Amendment right to a fair trial in violation of the Sixth Amendment to the__

_____Constitution of the United States.__

Yes ___X___   No ____

(7) Result: __60-1507 Petition was denied.__

(8) Date of result (if you know): __08/20/2020__

(b) If you filed any second petition, application, or motion, give the same information: _____

(1) Name of court: __In the Court of Appeal of the State of Kansas.__

(2) Docket or case number (if you know): __20-123438-A__

(3) Date of filing (if you know): __06/08/2021__

(4) Nature of the proceeding: __Appeal__

(5) Grounds raise: __The evidence showed trial counsels' conduct so undermined the proper functioning of the__

_____adversarial process that Mr. Stenberg's trial cannot be relied on as having produced a just__

_____result.  The district court erred as a matter of fact and law when it denied Mr.  Stenberg's__

_____60-1507 motion__

_____
_____
_____
_____
_____

(6) Did you receive a hearing where evidence was given on your petition, appliation, or motion?

     Yes     _X_     No     ___

(7) Result:  Affirmed District Court's Drecision _____

(8) Ddate of result (if you know(:  02/25/2022 _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:  In the Supreme Court of the State of Kansas. _____

    (2) Docket or case number (if you know):  20-123438-A _____

    (3) Date of filing (if you know): 03/28/2022 _____

    (4) Nature of the proceeding:  Petition for Review _____

    (5) Grounds raised: _The court of Appeals erred by concluding that Mr. Steinberg was not prejudiced by trial counsel's deficient performance._

_____
_____
_____
_____
_____
_____

(6) Didi you receive a hearing where evidence was given on your petition, application, or motion?

     Yes     _X_     No     ___

(7) Result:  Petition for Review denied _____

(8) Date of result (if you know): 09/30/2022 _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

    (1) First Petition:     Yes    _X_    No   ___

    (2) Second Petition:   Yes    _X_    No   ___

    (3) Third Petition:    Yes    _X_    No   ___

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:_____

_____
_____
_____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds. State the <u>facts </u>supporting each ground.

<u>CAUTION:  To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.       </u>

**GROUND ONE:**  <u>Ineffective assistance of trial counsel; where the district courts' findings of fact and conclusions of law are unreasonably decided.       </u>

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support you claim.): _____

_____**SEE ATTACHED FACTS ▓▓▓▓▓▓▓▓▓▓▓▓FOR THIS GROUND ONE.**_____

*Starting at PAGE 17~18.* _____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground One, explain why:  <u>N/A</u>_____

_____

_____

_____

(c)  **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes  ____          No  <u>X</u>

    (2) If you did <u>not</u> raise this issue in your direct appeal, expalin why:  <u>This was raised in the collateral K.S.A. 60-1507,</u> <u>and Appeal of that decision.  TAC claims are usually raised in collateral attack in KS.</u>

(d)  **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes  <u>X</u>          No  ____

    (2) If your answer rto Question (d)(1) is "Yes," state:

    Type of motion or petition:  <u>K.S.A. 60-1507 Persons in Custody</u>_____

    Name and location of the court where the motion or petition was filed:  <u>Court of Appeals of the State of Kansas</u>

<u>                                                                                         </u>

    Docket or case number (if you know):  <u>123438-A</u>_____

    Date of the court's decision:  <u>02/25/2022</u>_____

Result (attach a copy of the court's opinion or order, if available): <u>Affirmed District Courts' Decision.  Copy of</u>
<u>journal Entry is attached, also Memorandum Opinion is attached.</u>

(3) Did you receive a hearing on your motion or petition?

Yes <u>_X_</u>          No ___

(4) Did you appeal from the denial of your motion or pertition?

Yes <u>_X_</u>          No ___

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes <u>_X_</u>          No ___

(6) Name and location of the court where the appeal was filed: <u>IN THE KANSAS SUPREME COURT</u>

Docket or case number (if you know): <u>123438-A</u>

Date of the court's decision: <u>09/30/2022</u>

Result (attach a copy of the court's opinion or order, if available<u>): PFR Denied.  A; copy of the decision is attached.</u>

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

<u>N/A</u>

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, ets.) that you
have used to exhaust your state remedies on Ground One: <u>K.S.A 60-1507,  APPEAL and PETITION FOR REVIEW...</u>
<u>This issue is exhausted.</u>

**GROUND TWO:** <u>Due process was violated when the investigating officer used threats and promises to coerce a</u>
<u>confession from the defendant.</u>

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support you claim.): _____

<u>_____**SEE ATTACHED FACTS.**▄▄▄▄▄▄▄▄▄▄**OR THIS GROUND TWO.**</u>

<u>_____*SEE*   *page.* 31–43▄</u>

(b) If you did not exhaust your state remedies on Ground Two, explain why:  N/A

_____

_____

_____

(c) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes  X         No  ___

    (2) If you did not raise this issue in your direct appeal, explain why:  N/A

_____

_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a stat trial court?

        Yes  X         No  ___

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition:  K.S.A. 60-1507 Persons in Custody

    Name and location of the court where the motion or petition was filed:  Gray County District Court,  Kansas

    Docket or case number (If you know):  2019-CV-000004

    Date of the court's decision:  08/20/2020

    Result (attach a copy of the court's opinion or order, (if available):  60-1507 Petition Denied.   Copy of Attached Journal Entry of 60-1507 Evidentiary Hearing is Provided.

    (3) Did you receive a hearing on your motion or petition?

        Yes  X         No  ___

    (4) Did you receive a hearing on your motion or pertition?

        Yes  X         No  ___

    (5) If your answer to Question (d)(4) was "Yes," did you raise this issue in your appeal?

        Yes  ___         No  X

    (6) If your answer to Question (d)(4) is Yes," state:

    Name and location of the court where the motion or petition was filed:  In The Court of Appels of The State of Kansas

    Docket or case number (If you know):  20-123438-A

    Date of the court's decision:  02/25/2022

    Result (attach a copy of the court's opinion or order, if available):  Affirmed District Court's Decision.  Copy of Memorandum Opinion is Attached.

(7) If your answer to question (d)(4) or Question (d)(5) is "No," explain why you did ot raise this issue:

<u>Because this issue was raised in the Direct Appeal  116,026A in the Court of Appeals of the State of Kansas</u>

_____

_____

_____

(e)  **Other Remedies:**  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two:  <u>Petition for Review in  116,026A in the Supreme Court</u>

<u>of the State of Kansas, whereby the PFR was Denied...  thus this issue is exhausted.</u>

**GROUND THREE:**  _____

_____

**(a) Supporting facts (Do not argue or cite law.  Just state the specific facgrts that support your clain):**

<u>N/A</u>_____

_____

_____

_____

_____

_____

**(b) If you did not exhaust your state remedies on Ground Three, explain why:**

<u>N/A</u>_____

_____

_____

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  __          No  ___

(2) If you did not raise this issue in your direct appeal, explain why:  <u>N/A</u>_____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a stat trial court?

Yes  __          No  ___

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:  <u>N/A</u>_____

Name and location of the court where the motion or petition was filed:  <u>N/A</u>_____

Docket or case number (If you know):  <u>N/A</u>

Date of the court's decision:  <u>N/A</u>

Result (attach a copy of the court's opinion or order, (if available):  <u>N/A</u>

_____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ____          No ____

(4) Did you receive a hearing on your motion or pertition?

    Yes ____          No ____

(5) If your answer to Question (d)(4) was "Yes," did you raise this issue in your appeal?

    Yes ____          No ____

(6) If your answer to Question (d)(4) is Yes," state:

Name and location of the court where the motion or petition was filed:  <u>N/A</u>

_____

Docket or case number (If you know):  <u>N/A</u>

Date of the court's decision:  <u>N/A</u>

Result (attach a copy of the court's opinion or order, if available):  <u>N/A</u>

_____

_____

(7) If your answer to question (d)(4) or Question (d)(5) is "No," explain why you did ot raise this issue:

<u>N/A</u>

_____

_____

_____

(e) **Other Remedies:**  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two:  <u>N/A</u>

_____

_____

**GROUND FOUR:** _____

_____

**(a) Supporting facts (Do not argue or cite law.  Just state the specific facgrts that support your clain):**

<u>N/A</u>

_____

_____

_____

**(b) If you did not exhaust your state remedies on Ground Three, explain why:**

N/A

**(c) Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ___        No ___

    (2) If you did not raise this issue in your direct appeal, explain why:  N/A

**(d) Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a stat trial court?

        Yes ___        No ___

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition:  N/A

    Name and location of the court where the motion or petition was filed:  N/A

    Docket or case number (If you know):  N/A

    Date of the court's decision:  N/A

    Result (attach a copy of the court's opinion or order, (if available):  N/A

    (3) Did you receive a hearing on your motion or petition?

        Yes ___        No ___

    (4) Did you receive a hearing on your motion or pertition?

        Yes ___        No ___

    (5) If your answer to Question (d)(4) was "Yes," did you raise this issue in your appeal?

        Yes ___        No ___

    (6) If your answer to Question (d)(4) is Yes," state:

    Name and location of the court where the motion or petition was filed:  N/A

    Docket or case number (If you know): N/A

    Date of the court's decision:  N/A

    Result (attach a copy of the court's opinion or order, if available):  N/A

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:  N/A

_____

_____

_____

_____

(e) **Otehr remedies:**  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:  N/A

_____

_____

_____

_____

13. **EXHAUSTION -** Please answer these additional questions abour the petition you are filing:

(a) Have all grounds for relief that you have raised in this petiti;on been presented to the highest state court having jurisdiction?        Yes _X_        No ___

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:  N/A

_____

_____

_____

(b) Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been prsented, and state your reasons for not presenting them:  N/A

_____

_____

14. **SUCCESSIVE APPLICATIONS -** Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenged in this petition?        Yes ___        No _X_

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result foreach petition, application, or motion filed.  Attach a copy of any court opinion or order, if availabe.  N/A

_____

_____

_____

_____

_____

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?                      Yes _____          No _X_

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _N/A_____

    _____

    _____

    _____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing: _Peter J. Antosh,  1401 Central Ave.  Dodge City, Kansas_____

    _____

    (b) At arraignment and plea: _Same_____

    _____

    (c) At trial: _Same_____

    _____

    (d) At sentencing: _Same_____

    _____

    (e) On appeal: _Christina M. Kerls, Kansas Appellate Defender's Office, Jayhawk Tower, 700 Jackson Suite 900
        Topeka, Kansas 66603-3733_____

    (f) In any post-conviction proceeding: _Jennifer C. Roth, KADO, Jayhawk Tower 700 Jackson Sutie 900, Topeka
        Kansas 66603-3733_____

    (g) On appeal from any ruling against you in a post-conviction proceeding: _Jennifer C. Roth, KADO, Jayhawk
        Tower 700 Jackson Sutie 900, Topeka, Kansas 66603-3733_____

17. Do you have any future sentence to serve after you complete the sentence for the judgement that you are challenging?              Yes _          No _X_

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future: _N/A___

    _____

    (b) Give the date the other sentence was imposed: _N/A_____

    (c) Give the length of the other sentenvce: _N/A_____

    (d) Have you filed, or do you plan to file, any petitioin that challenges the judgment or sentence to be served in the future?              Yes _          No _X_

18. TIMELINESS OF PETEITION:  If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C.  § 2244(d) does not bar your petition.*

<u>Please see page 14(a)... next page.</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA") as contained in 28 U.S.C.  § 2244(d) provides in part that:

(1) A one-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of ---
(A) the date of which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review:
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action:
(C) the date on which the constitutional right assertred was initially recognized by the Supreme Court , if the right has vbeen newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review: or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2)  The time during which a properlly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

**Timeliness of Petition**

Case No.  14CR170

Trial Held in January of 2016

Sentence Imposed April 5, 2016

Notice of Appeal filed April 12, 2016

DIRECT APPEAL Decided October 6, 2017

PETITION FOR REVIEW Filed November 6, 2017...........................................**30** days had elapsed

PETITION FOR REVIEW DENIED on April 27, 2018


Case No. 2019-CV-000004

K.S.A.  60-1507 Mailed February 25, 2019 (mailbox rule) **304** days + **30** = **334** days total elapsed

K.S.A.  60-1507 Stamped Electronically filed on March 5, 2019

**STATUTE OF LIMITATIONS SUSPENDED** beginning on March 9, 2020

Evidentiary Hearing Held on June 29, 2020

Petitioner's Proposed findings of fact filed on July 8, 2020

State's Proposed findings of fact filed on July 17, 2020

K.S.A.  60-1507 Decided on August 20, 2020

Notice of Appeal filed August 26, 2020

APPEAL timely filed on June 8, 2021

**STATUTE OF LIMITATIONS SUSPENSION LIFTED** on August 2, 2021

APPEAL Decided on February 25, 2022  Clock starts running...

PETITION FOR REVIEW filed March 28, 2022....................**31** days elapse for a total of **365** days

PETITION FOR REVIEW DENIED on September 30, 2022

90 DAYS TO FILE A WRIT OF CERTIORARI begins on September 30, 2022

**DEADLINE ENDS ON December 29,2022 to file 28 U.S.C. § 2254**

Therefore, petitioner asks that the Court grant the following relief: <u>OVERTURN HIS CONVICTION</u>

_____

_____

or any other relief to which petitioner may be entitled.


<u>N/A</u>_____

Signature of Attorney (if any)



I declare (or certify, verify, or state) under penalty of perJury that the foregoing is true and correct and that this

Petition for Writ of Habeas Corpus was placed in the prison mailing system on_____

<u>DECEMBER  21, 2022</u>_____(month, date, year)>



Executed (signed) on <u>12/21/22</u>_____(date)



Signature of Petitioner


If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing

this petition. <u>N/A</u>_____

_____

_____


• • • • •

**STATE V. STENBERG**
**Case No. 14 CR 170**
Attachments to Habeas Petition

9(f)  Grounds Raised on Direct Appeal
    1.    The district court erred in denying Mr. Stenberg's motion to suppress.
    2.    The distict court committed reversible error in failing to instruct the jury on the lesser included offense of attempted rape.
    3.    The district court erred in imposing lifetime postrelease supervision.

9(g)(6)  Grounds Raised in Petition for Review
    1.    The district court erred in denying Mr. Stenberg's motion to suppress.
    2.    The distict court committed reversible error in failing to instruct the jury on the lesser included offense of attempted rape.

**STENBERG V. STATE**
**Case No. 19 CV 4**
Attachments to Habeas Petition

11(a)(5)  Grounds Raised in K.S.A. 60-1507 Persons in Custody Petition
    1.    Ineffective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States.

    Appellate Counsel was ineffective by:

    a.    inadequately arguing how the district court erred in denying Mr. Stenberg's motion to suppress.
    b.    failing to raise the meritorious issue of the ineffective assistance of trial counsel.

    2.    Ineffective assistance of trial counsel in violation of the Sixth Amendment to the Constitution of the United States.

    Trial Counsel was ineffective by:

    a.    failing to investigate witnesses.
    b.    failing to secure and call an expert witness to regute prosecution's experts' testimony.

    3.    Denied due process under the Fifth Amendment to the constitution of the United States.

    Due Process was violated when:

    a.    the investigating police officer used threats and promises to coerce a confession from the defendant.

4.     Denied the Sixth Amendment right to a fair trial in violation of the Sixth Amendment to the Constitution of the United States.

Defendant did not receive a fair trial because of the following:

a.     The ineffective asistance of counsel.
b.     The admission of a confession obtained by the use of unfair tactics and coersion.

### STENBERG V. LANGFORD
Attachments to Habeas Petition

13.    GROUNDS FOR RELIEF

GROUND ONE: **Ineffective assistance of trial counsel in violation of the Sixth Amendment to the Constitution of the United States**, where the district court's findings of fact and conclusions of law were unreasonably decided in **Case No. 19 CV 4**, and the Court of Appeals of the State of Kansas' rulings were also unreasonably decided.
This issue was exhausted in the Court of Appeals of the State of Kansas, and again, in a Petition for Review to the Supreme Court of Kansas.

SUPPORTING FACTS

Stenberg moved for **postconviction relief under K.S.A. 60-1507** asserting, among other things, that Antosh provided constitutionally defective representation at trial. The district court appointed counsel to represent Stenberg on the motion, and the parties narrowed the issues to be considered. Stenberg continued to assert that Antosh was ineffective for

• failing to prepare Stenberg to testify;

• failing to investigate and call potential defense witnesses;

• failing to call an expert to review the victims' forensic interviews; and

• failing to perform certain pre and posttrial functions, including filing a departure motion at sentencing.

The district court held an evidentiary hearing on Stenberg's motion in June 2020, where both Stenberg and Antosh testified. Stenberg stated that he provided Antosh with a list of potential witnesses for his defense, and Antosh failed to contact any of the people on that list. Stenberg also stated that Antosh did not prepare him to testify at all and only broached the issue in passing in the middle of the trial.

During his testimony, Antosh explained that his case strategy centered on the motion to suppress Stenberg's confession. When that effort was unsuccessful—meaning Stenberg's confession would be presented to the jury—Antosh felt that Stenberg's likelihood of prevailing at trial was slim. He

concluded that the best strategy was to hold the State to its burden of proof and seek review of the suppression issue on appeal. As to the four allegations in Stenberg's K.S.A. 60-1507 motion:

• Antosh stated that Stenberg knew he had a right to testify but chose not to based on Antosh's advice. Antosh felt that Stenberg would not be a compelling witness and that his testimony could have abandoned any appeal of the suppression issue.

• Antosh acknowledged that he did not call the people on Stenberg's list of potential witnesses. He explained that the people Stenberg identified **were character witnesses—a point Stenberg disputes**—whose testimony would have invited the State to admit evidence of Stenberg's previous sex crimes.

• Antosh testified that he did not consider calling an expert to review the girls' interviews because both K.P. and A.P. testified at trial. Antosh also indicated that he did not think an expert would have made a difference at trial, **given Stenberg's confession to the crimes.**

• Antosh indicated he did not file a departure motion because **he felt that it would conflict with Stenberg maintaining his innocence.**

After the hearing, the district court denied Stenberg's motion. **The court found** Antosh more credible than Stenberg and thus believed that Antosh adequately prepared Stenberg to testify if Stenberg had chosen to. The court also **found that Antosh's decision not to investigate character witnesses was sound strategy given Stenberg's history**, and that expert review of the victims' interviews would make no difference because they testified at trial. The court did not directly address the departure issue, other than to say there was no factual support for the allegation that Antosh failed to perform certain pretrial and posttrial functions. On the whole, the court determined that Antosh acted reasonably and, even so, **there was no prejudice given Stenberg's confession.** Stenberg appeals.

 **Stenberg adopts** all of the arguments counsel Jennifer C. Roth made in the Brief she filed on behalf of Stenberg in No. 20-123438-A, Case No. 19 CV 4, pp. 1-31.

 Stenberg's overarching argument on appeal is that Antosh's representation was constitutionally defective because he did not have a backup plan after the district court denied the motion to suppress. Stenberg asserts that this strategy—or lack thereof—is shown by the same four grounds raised below: failing to prepare Stenberg to testify, failing to investigate Stenberg's proposed witnesses, failing to consult an expert about the victims' interviews, and failing to file a departure motion. **The State counters that these were reasonable strategic decisions** by Antosh, and **Stenberg cannot show prejudice because of the strength of the other evidence at trial—especially the confession and the victims' testimony.**

Stenberg v. State, 504 P.3d 461, 461, 2022 Kan. App. Unpub. LEXIS 112, *8-9, 2022 WL 570830 (Kan. Ct. App. February 25, 2022)

## STENBERG'S ARGUMENT

First, the district court concluded, "this interrogation was nothing more than a normal interrogation." (R.8:122). Stenberg argues this interrogation consisted of promises and threats, and was nothing like a normal interroagation. Stenberg claims the district court's decision is unreasonable considering the facts and the law.

Second, trial counsel did not file a motion for a departure. (R. 3, generally). Trial counsel made no mention at sentencing about how the counts should run. (R. 10: 2-56). Trial counsel made no commenta at all about Mr. Stenberg's sentence. (Rk. 10: 2-5). The court ran two of Mr. Stenberg's life sentences consecutively, resulting in a Hard 50. (R. 10: 8). Stenberg claims trial counsel did not effectively represent Mr. Stenberg's interests during sentencing. This left Stenberg without representation during this critical stage of the sentencing process.

Third, in Case 19 CV 4, the 60-1507 motion, after the Court affirmed his conviction, Mr. Stenberg filed a motion pursuant to K.S.A. 60-1507. (R.1: 3). Stenberg set out the ways his trial counsel was ineffective:

- He failed to investigate seven witnesses that Mr. Stenberg told him about. Mr. Stenberg's motion included what the witnesses would have testified about. (R. 1: 8).

- He failed to get an expert witness to refute the prosecution's expert. (R. 1: 4).

- He failed to put the complaining witnesses' testimony to adversarial testing. (R. 1: 9).

- He failed to file a downward departure as requested by Mr. Stenberg. (R. 1: 9).

The district court appointed Mr. Stenberg an attorney to represent him on his 60-1507 motion, ans set the motion for a hearing after the parties agreed there should be an evidentiary hearing. (R. 1: 1, 39).

Motion counsel summarized the issues they were not proceeding with; she referred to issues by numbers that did not match Mr. Stenberg's filing, but she was clear that they were not proceeding on anthing to do with appellate counsel or the Kansas Supreme Court's denial of Mr. Stenberg's petition fro review after this Court affirmed his convictions. (R. 2: 7).

*Motion testimony*

There were two witnesses at the hearing, Mr. Stenberg and Mr. Antosh. (R. 2: 2). Mr. Stenberg was now 52 and had never had a trial before this one. (R. 2: 10, 57). Mr. Antaosh had practiced law for 17 years with about 60% of his practice being criminal representation. (R. 2: 61). Here is what the witnesses said about each topic area.

**Trial strategy/preparation.** Mr. Stenberg testified there was no discussion of trial strategy and no preparing him to testify in his own defense. (R. 2: 13, 26). Aftyer they lost the

suppression motion, there was no attempt to formulate a defense:  "[Mr. Antosh] basically said we had a 10 percent chance of winning [at trial], and that we would win it on appeal."  (R. 2: 35). He wrote questions down for Mr. Antosh during the trial, but he ignored them.  (R. 2: 46).

Mr. Stenberg thought the first time he was asked if he wanted to testify was at his trial. On the advice of his attorney, he did not testify, but lack of preparation was a factor in his decision. (R. 2: 27). He wanted to testify about why he confessed, i.e. Undersheriff Sharp's threats, promises of a deal, and so on. (R. 2: 45, 51).  The jury did not see his interview with Sharp--the State only admitted his written statement, which came about only after over 1-1/2 hours of interrogation, during which Mr. Stenberg denied anything happened.  (R. 9, part 2: 17). Mr. Stenberg felt if he had testified, the jury "possibly could have understood what my state of mind was and what my reasons were for finally admitting to something."  (R. 2: 31).

Mr. Antosh agreed that "an enormous about" of his trial strategy was to suppress Mr. stenberg's statements.  (R. 2: 67).  He testified  the comment about a 10% chance of winning at trial "sounds like verbatim like somthing I would have said, yes."  (R. 2: 67).  Then there was this exhange between motion counsel and Mr. Antosh:

A.     ...we were trying this case... with the idea of there is a couple of areas where the State might make some mistakes.  The idea wasn't for us to present a compelling defense.  The idea was for us to present a sparse defense, hope the Stae committed some errors, and preserve his ability to maybe get a more favorable shake on a retrial if we were successful with the appeal on suppression.

Q.     So, I belive you just stated -- you used the word sparse?

A.     Yes.

Q.     Would it be reasonable for a defendant, in that situation you just described, to feel like we're not doing a lot here in terms of putting on a defense?

A.     Oh, certainly.

Q.     All right. So, if he had come away feeling that way, he did so honestly.  Is that a fair statement?

A.     Yes.

(R. 2: 69).

Mr. Antosh testified that he knew "immediately" after his "first or second conversation" with Mr. Stenberg that he did not want to put Mr. Stenberg on the stand. (R.         2: 98).  When he and Mr. Stenberg met a couple of days before trial, they discussed whether or not Mr. Stenberg should testify.  Mr. Antosh admitted that "this trial was exsclusively about how do you combat somebody ... [admitting] to doing these horrible things?"  (R. 2: 76-77).  (R. 2: 64).

Despite knowing this was the main problem, Mr. Antosh told Mr. Stenberg "it would be a terrible idea for him to get up on the stand and talk about it.  At which point in time, he would have basically abandoned his right to appeal the issue of suppression."  (R. 2: 68).

**Getting an expert.**  Mr. Stenberg asked Mr. Antosh about an expert regarding the disclosures made by the girls. (R. 2: 29).  He could not recall Mr. Antosh's answer, and he didn't know if there was a consultation.  (R. 2: 30).

Mr. Antosh could not remember if Mr. Stenberg brought up the idea of an expert, but testified it "didn't cross [his] mind to get someone to review K.P. and A.P.'s interviews with Senior Special Agent Popejoy to see if they were overly suggestive. (R. 2: 76).  He admitted "probably it wouldn't hurt." (R. 2: 76). He said he wouldn't be suprised if there was caselaw out there suggesting that an attorney should confer with an expert regarding child interviews. (R. 2: 76).

**Motin for a departure.**  Mr. Antosh explained the he "did not file a motin for departure because that is inconsistent with asserting innocence on appeal." and to "advance a successful motion to depart, you need to take some guilt"--it is "effectively incompatible" to ask for a departure without an admission. (R. 2: 73-74).

**List of witnesses.**  Mr. Stenberg testified he sent Mr. Antosh a letter  with a list of witnesses he wanted him to contact. (R. 2: 14).  Mr. Stenberg talked about the seven people on that list: who they were, what they would have been able to testify to, and so on.  (R. 2: 14-22).  Mr. Stenberg testified Mr. Antosh told him that he did not think the witnesses would be beneficial and could be harmful, but "[h]e decided that without even contacting them to find out what they could testify to." (R. 2: 47-48).

Mr. Antosh remembered receiving letters, and admitted he did not get in touch with any of the suggested witnesses. (R. 2: 70).  He admitted he did not have a full understanding of what they would have said, but thought they were mostly character witnesses. (R. 2: 70).  When asked "what harm could have possibly come from just meeting with these witnesses to see what they had to say," Mr. Antosh said there would be no harm but, "there was nothing they could say that I think would be useful given out trial strategy." (R. 2: 71).  Mr. Antosh testified that the "sparse defense" was a trial strategy decision, but admitted he made the decision that the witnesses would be more harmful that helpful without ever talking to them. (R. 2: 83-84).

Bringing several topics together at the end of her redirect, motion counsel had this exchange with Mr. Antosh:

> Q.      So, if you can't, essentially, kinda beat up on child victims, and you can't get anywhere with your client tyestifying, why on earth would you give up this seven potential witnesses not knowing what they might say?

A.     Um...

Q.     They're adults.  They can handle themselves.

A.     Okay.  With those - let's say that I had called them - well, okay, I guess if we go
       back to - to decision trees and when decisions were made, and, certainly, I hadn't
       subpoenaed them, so I can't - and, I'm not saying that this was a decision that came
       down to a last minute trial tactic, because I've subpoenaed you, you're summoned,
       you're here, but I'm not going to use you.  It wasn't - it wasn't anything like that,
       but -

Q.     There's - there is a basic point that I'm trying to make.

A.     Yeah.

Q.     You didn't have a defense, is that true?

A.     Um...**I guess it depends on what you mean by a defense.**  Did we have a case in
       chief that we were presenting?  Did we have an alternate version of facts?  Did we
       have a coherent you're going to either believe this by the State or you're going to
       believe this by us, you're going to weight it how you wiegh it?  Did we have a big
       plan?  No.  **The strategy, the defense was see if the State makes mistakes,
       catch them on mistakes.**

(R. 2: 98-99)(emphasis added).  Mr. Antosh again admitted that the defense had nothing to
       present to contradict the State's case.  (R. 2: 100).

**Filings and the court's decision**

The parties did not argue once the witnesses finished; instead, each side submitted
proposed findings of facts and conclusions of law.  (R. 1: 52, 63; R. 2: 101).  Mr. Stenberg
continued to allege that Mr. Antosh (1) failed to investigate witnesses; (2) failed to secure and
call an expert witness; (3) failed to perform certain pre and post-trial functions; and (4) failed to
prepare the defendant to testify such that his right to do so was thwarted.  (R. 1: 52-53).  "**Antosh
esentially conceded a guilty verdict and made no attempt to put together an alternative
defense strategy.**"  (R. 1: 56).  This conscession, and the actions taken (or not taken), rendered
trial counsel ineffective: (emphasis added)

Where counsel asserts that the sole defense strategy failed prior to trial **there is an
inherent need to further investigate issues and witnesses,** particularly where witnesses
have come forward and "volunteered" to testify, to determine what other defenses may be
available.  **Counsel cannot simply concede guilt because the primary defense strategy
has failed, even where counsel is hoping to win back that option by appeal.**

The failure to seek out winesses and investigate, or make even the slightest effort toward
identifying a backup defense, taken as a whole, rendered counsel ineffective.  **The**

> **cumulative result of counsel's failure to consult with witnesses, failure to prepare Stenberg to testify as to the circumstances surrounding his "confession," whatsoever, is that confidence cannot be placed in the outcome of the petitioner's trial.**

(R. 1: 57-58) (emphasis added).

The court denied Mr. Stenberg's motion in a written journal entry. (R. 1: 76). The court noted there were only two witnesses at the hearing, and no affidavits were admitted about what the suggested witnesses would have testifeid about. (R. 1: 78). The court's findings of facts included:

- Mr. Stenberg's intelligence was above average and "[h]e presents as confident and not easily persuaded to do something he did not want to do." (R. 1: 78).

- Mr. Stenberg was not a credible witness. "his memory of things was colored to his self-interest and often inaccurate as a result." (R. 1: 78).

- Mr. Antosh was "a very credible witness" who was "very forthcoming about thier trial strategy." (R. 1: 79).

- There was no credible evidence that the people Mr. Stenberg mentioned were anything other than character witnesses. (r. 1: 79).

- The evidence of guilt was "very substantial" in that it included a videotaped confession and signed statement, along with prior crimes evidence that did not come in at trial (R. 1: 79).

- "[t]here was no evidence in this case that getting an expert to review the interviews of the young victims would have offered anything relevant," and "it appears little to no wieght was placed [by the jury] on the out-of-court interviews of the young victims." R. 1: 80).

The court conclued that Mr. Stenberg did not establish that Mr. Antosh "fell below an objective standard of reasonableness," and its conclusion of law included:

- It was "sound trial strategy" for Mr. Antosh not to investigate the witnesses Mr. Stenberg mentioned because they were all character witnesses. (R. 1: 81).\

- "There is no indication such an expert [to review the girls' interviews] would have provided  any relevant information in this case -- especially since it appears the young victims' court testimony was good evidence for the State." R. 1: 82).

- Mr. Stenberg's argument about falure to perform cerain pretrial and post-trial functions is not independently argued and "the Court finds no factual support for this allegation." (R. 1: 82).

- "[T]he facts are clear [Mr. Stenberg] was prepared both before the trial and had additional time at the trial to again consult with Antosh before he made the final decision not to testify." (R. 1: 82).

The court also decided there were only "conclusory allegations" that Mr. Antosh's representation prejudiced Mr. Stenberg. (R. 1: 82). "The reality is that the best defense for Stenberg was to get his written and videotaped confessions suppressed." (R. 1: 82). Mr. Antosh's "strategy" to "limit the additional corroborating evidence" kept the State from putting on "rebuttal evidence which would have likely included Stenberg's prior sex crimes." (R. 1: 83).

Mr. Stenberg filed a timely notice of appeal. (R. 1: 85).

## ANALYSIS

The benchmark in evaluating a cliam of ineffective assistance of counsel "must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial connot be relied on as having produced a just result. *Chamberlain*, 236 Kan. at 656. To obtain rebersal of conviction based on ineffectiveness, a petitioner must show 1) that counsel's performance was deficient under the totality of the circumstances and 2) that the deficient perfomance prejudiced the defense so as to deprive the petitioner of a fair trial. *Stickland*, 466 U.S. at 687; *Chamberlain*, 236 Kan. at 656. To meet the first "prong' of this test, a petitioner must show

> counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

*Chamberlain*, 236 Kan. at 656-57 (adopting *Strickland* . 466 U.S. at 689). When assessing the totality of the circumstances, "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690.

As for the second prong, a petitioner must show "there is a reasonable probability the jury would have reached a different result absent the deficient performance." *State v. sola-Martines*, 300 Kan. 875, 885, 335 P.3d 1162 (2014). " A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694-96. As to sentencing, a petitioner "must show that counsel's errors were so serious that they deprived him of a fair sentencing proceeding." *Baker v. State*, 57 Kan. App. 2d 561, 571, 457 P. 3d 183 (2019) (citing *Strickland*, 466 U.S. at 696), review denied (Sept. 29, 2020), Leben, J. dissenting.

page 25

These findings were not supported by substantial competent evidence. To the contrary, Mr. Antosh admitted they did not have a trial strategy other than, in a nutshell, hope the State "just mess[ed] up in some unexpected way," (R. 2: 79 and not introduce any defense evidence -- therefore, there was no trial strategy to discuss. In fact, Mr. Antosh agreed that "certainly" Mr. Stenberg could honestly come by the "feeling that we're not doing a lot here in terms of putting on a defense." (R. 2: 69). Mr. Antosh also admitted he did not contact any of the witnesses Mr. Stenberg suggested.

Although Mr. Stenberg had prior convictions, the uncontroverted evidence was that this was his first trial. There was no evidence presented that Mr. Stenberg was "above average in regard to his understanding of his rights and responsibilities in the trial process." And there was no evidence that he had ever faced charges as serious as these, contrary to the court's findings and rulings in this matter.

As for Mr. Stenberg testifying, the court found "the facts are clear [Mr. Stenberg] was prepared both before the trial and had additional times at the trial to again consult with Antosh before he made the final decision not to testify." (R.2: 82). Again, the first part of this statement was not supported by substantial competent evidence (Mr. Stenberg acknowledges the record shows there was a break in the trial for him to talk to Mr. Antosh).

Mr. Antosh admitted he knew from his first or second converstation with Mr. Stenberg -- in a representation that lasted 14 1/2 months from the time he was appointed to the first day of trial -- that he didn't want Mr. Stenberg to testify. Talking to someone about how it would be "terrible" if they testified is not "preparing" them to testify. There was no evidence presented that Mr. Antosh and Mr. Stenberg actually prepared in the event Mr. Stenberg went against Mr. Antosh's unwaivering advice that he not testify. In other words, the uncontroverted evidence was there was not time spent actually preparing Mr. Stenberg to testify in his own defense.

*Mr. Antosh's failure to investigate witnesses*

The court found there was not credible evidence that the people Mr. Stenberg mentioned were anything other than character witnesses. (R.2: 79). The court found that Mr. Stenberg admitted on cross-examination that all of his witnesses would be character witnesses. (R. 1: 78). The court found it was "sound trial strategy" for Mr. Antosh not to investigate the witnesses Mr.

*page 26*

Stenberg mentioned because they were all character witnesses. (R. 2: 81). This finding, which echoed incorrect testimony from Mr. Antosh, was not supported by substantial competent evidence.

The evidence showed the people Mr. Stenberg suggested were not all character witnesses. Even in his written motion, Mr. Stenberg explained they could address 1) how the children would try to get their mother's attention, 2) that the girls had "prior inadvertent exposure to sexual acts and had previously acted them out," and 3) how the parent's bedroom door was open. (R. 1: 8). some of them could have been fact witnesses -- ones that Mr. Antosh admitted he did not even contact.

Furthermore, the court's legal conclusion that Mr. Stenberg calling any witnesses was tantamount to the State being able to put on rebuttal evidence of Mr. Stenberg's prior crimes was wrong. Again, not all of the people Mr. Stenberg suggested would have been character witnesses.

Finally, Mr. Stenberg's testimony was the opposite of the court's finding regarding his belief about what type of witnesses the people would have been. During cross-examination, Mr. Stenberg said "I didn't believe them to be just character witnesses. I believed them to be fact witnesses, as to being witnesses that lived in the home and were around me or the girls at all times." (R. 2: 40).

*Mr. Antosh's failure to get an expert witness*

The court found "[t]here was no evidence in this case that getting an expert to review the interviews of the young victims would have offered anything relevent," and "it appears little to no weight was placed [by the jury] on the out-of-court interviews of the young victims." (R. 2: 80, 82).

These findings were not supported by substantial competent evidence. First, there was no evidence of what the jury considered, how it weighted evidence, etc. Second, the videotaped interviews with A.P. and K.P. were not simply played without context -- the State called KBI Senior Special Agent Popejoy to testify about here experience as a law enforcement officer, her training and the protocol she uses to interview children, how she came to interivew A.P. and K.P,

*page 27*

what the interview was like, what the girls' demeanors were, whether their language was appropriate for their age, that it was her opinion that penetration of K.P. had occurred, etc. (R. 9, part 1: 282-333). In its final questions, the State asked Senior special agent Popejoy if she had "ever left a forensic interview convined that allegations were not supported," and she said yes. (R. 9, part 1: 348). It then asked, "Did you leave interviewwith [K.P. and A.P.] with that same feeling, or did you feel the allegations were supported by the testimony/" (R. 9, part 1: 348). With no objection from Mr. Antosh, Popejoy replied, "I believe the allegations were supported by the testimony." (R.9, part 1: 348).

At the time of the trial, K.S.A. 21-6627 (commonly referred to as Jessica's law) was almost 10 years old. See 2006 HB 2576. Mr. Antosh testified he "had probably represented, I don't know, half dozen to 10 prior Jessica's Law clients. We had taken one case to trial. We won it. And, we just probably resolved the rtest of them. We never lost a Jessica's Law trial, I don't believe." (R. 2: 81). Despite his experience, it "didn't cross [his] mind to get someone to review K.P. and A.P.'s interviews with Senior Special Agent Popejoy to see if they were overly suggestive. (R. 2: 76). He admitted "probably it wouldn't hurt." (R. 2: 76). He said he wouldn't be surprised if there was caselaw out there suggesting that an attorney should confer with an expert regarding child intereviews. (R. 2: 76).

In fact, there was caselaw on this. For example, in *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002) -- which predates K.S.A. 21-6627, i.e. *Mullins* was during a time when the presumptive sentence was not life, and came out about 14 years before Mr. Stenberg's trial -- this Court concluded that trial counsel's performance was deficient because he did not call an expert to rebut the testimony of a nurse or the child. *Mullins*, 30 Kan. App. 2d at 717. At that 60-1507 hearing, a criminal-defense attorney testified that "the use of experts in this type of case was crucial and that fact was well known at the time of *Mullins*' criminal trial." Id. (italics in original). This Court held that under the facts, "[d]efense counsel was ineffective in failing to ever consider hiring an expert, either for use at trial or for use in preparation of corss-exam[] of the State's witnesses." *Mullins*, 30 Kan. App.2d at 711, Syl. ¶ 3.

*Deficient performance*

With all of the above in mind, we go back to the test. The first prong of the *Strickland*

*page 28*

test requires Mr. Stenberg to prove that, under the totality of the circumstances, his counsel's performance fell below an objective standard of reasonableness.

Mr. Antosh had "a duty to make reasonable investigations or to make a reasonable decision that makes particular investingation unnessassary." *State v. Hedges*, 269 Kan. 895, 914, 8 P.3d 1259 (2000). Counsel "cannot disregard pursuing a line of investigation and call it 'trial strategy'". *State v. James*, 31 Kan. App. 2d 548, 554, 67 P.3d 857, *review denied* 276 Kan. 972 (2003).

There is no "heavy measure of deference" (Hedges, 269 Kan. at 914) that this Court must apply to Mr. Antosh because he admitted that getting an expert eregarding the child interviews did not "cross his mind." He admitted he did not look into Mr. Stenbergt's witnesses; furthermore, he incorrectly assumed they would be character witnesses only. In light of the factual and legal errors presented by this case, and for all of the reasons Mr. Stenberg points out above, Mr. Antosh's trial representation fell below the objectie standard of reasonableness, and the diestrict court [unreasonably] erred in finding otherwise.

*Prejudice*

The second prong of the Strickland test requires a showing of prejudice, i.e., that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the defendant's case would have been different. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012) *citing Beldsoe v. State*, 283 Kan. 81, 90-91, 150 P.ed 868 [2007]).

The court decided there were only "conclusory allegations" that Mr. Antosh's representation prejudiced Mr. Stenberg. (R. 2: 82). "The reality is that the best defense for Stenberg was to get his written and videotaped confession suppressed." (R. 2: 82). Mr. Antosh's "strategy" to "limit the additional corroborating evidence" kept the State from putting on rebuttal evidence which would have likely included Stenberg's prior sex crimes." (R. 2: 83). This finding was not supported by substantial competent evidence and, in its abesence, there was no basis for the court's legal conclusion.

Mr. Antosh characterized this case as "this trial was exclusively about how do you combat" Mr. Stenberg's "confession" that he did "these horrible things?" (R.2: 76-77). (R.2:64).

*page 29*

Everyone knew that was the main problem: the State emphasized it in its proposed findings and the court pointed to it as "very substantial" evidence of Mr. Stenberg's guilt. (R. 1: 69, 79). In so doing, everyone made Mr. Stenberg's point for him: despite knowing this was the biggest hurdle, Mr. Antosh **made no plan for dealing with it** after the court denied the motion to suppress the statements. The "best defense" of getting the "confessions suppressed" was no longer a trial defense when the court denied the motion. And to make matters worse, the jury had no context -- other than Mr. Antosh reading some pages from the transcript of the interview during cross-examination -- for Mr. Stenberg's daming written "confession." (R. 9, parts 1 and 2).

Another compelling example of prejudice to Mr. Stenberg -- and evidence of Mr. Antosh's lack of trial strategy -- was his opening statement at trial, given immediately after the State's opening:

"May it please the Court, counsel. That's why this morning was so important. The Defendant is accused of doing some very horrible things, unquestionably very horrible things.

The testimony that you will hear today, as [the prosecutor] said, will be troubling, I mean very troubling, which is why we were asking this morning: Do you have your mind made up already when you hear the accusations?

You will hear, most likely, the things that Mr. Stenberg is accused of having done from the mouths of a lot of people other than the alleged victims. And, you may be tempted, given that the alleged victims are so young and tender in age, to give them -- to give their words extra weight.

We are not asking you to completely suspend disbelief. We're not going to ask you to go on a leap of faith that all of these things are just a series of random troubling consequences.

What we are going to ask you to do is to consider that there may very well be a good reason that we are here today, and the evidence, rather, the statements that came out that you'll see were said, other than that they were true. I garbled that a little bit.

I wonder if necessarily you'll be thinking after you hearing some of the evidence, after you see some of the evidence that comes out, that we anticipate will come out, if you won't say to yourself -- if you won't make up your mind just immediately.

All that we ask is that you be true to your oaths that you took as jurors. I ask that you haven't made up your -- I ask that you not have your mind made up already, even before any evidence has be presented. And, I knew it was gonna be dicey. I ask you to keep open minds. Thank you."
(R. 9, part 1: 185-86).

There is absolutely no information relayed to the jurors that would even suggest a

*page 30*

defense, or even that the defendant is innocent until proven guilty beyond a reasonable doubt. The defendant might have just as well had no attorney at all.

Taking into account the totality of the circumstances, this Court must conclude there is a reasonable probability that undermines our confidence in the outcome of Mr. Stenberg's trial, and that these matters were unreasonably decided in the district court.

*page 31*

GROUND TWO: **Dur Process was violated when the investigating police officer used threats and promises to coerce a confession from the defendant, in violation of the Fifth Amendment to the Constitution of the United States.**

FACTS

John Stenberg has asserted from the beginning that his statements, both oral and written, given to Undersheriff Sharp were not voluntary, and thus were inadmissible. The Court of Appeals and the Kansas Supreme Court agreed that Undersheriff Sharp used coercive tactics, but **found that under the totality of the circumstances, his statements were voluntary.** SEE Memorandum Opinion No. 116,026, State v. Stenberg, 2017 Kan. App. Unpub LEXIS 851, 404 P.3d 365 (2017), and State v. Stenberg, 2018, Kan. LEXIS 191 Petition for Review denied.

The Court of Appeals agreed that Undersheriff Sharp made inappropriate threats to Mr. Stenberg, but disagreed that there were inappropriate promises. SEE Slip Op. at 8-9. Movant however, contends the Court of Appeals and the Kansas Supreme Court has overlooked the specific promise by Undersheriff Sharp:

> "If you accept this that you made a mistake and you man up to things, Giardine *will take* a plea agreement on it at my recommendation." Emphasis mine.
> SEE (R. IX, Appendix B, Title 2) and/or SEE Petition for Review page 5, item (10) in italics.

The above statement is clearly an implied promise that if the defendant confesses Undersheriff Sharp would go to the prosecutor "Giardine" **who would accept** [take] a plea agreement on it **at Undersheriff Sharp's recommendation.** At the very least, Undersheriff Sharp is promising to make the recommendation, which the rest of the promise "Giardine will take a plea agreement on it..." is beyond Undersheriff Sharp's authority to produce the results promised.

The manner in which the statement was made by Undersheriff Sharp, implies a promise of Leniencey for the Confession. It is unlawful when police prmise leniencey for a confession, SEE Moore v. Czerniak, 534 F.ed 1128 (CA9 2008), where the Petitioner, a state prisoner who had pled no contest to one count of felony murder with a firearm, appealed from a judgment of the United States District Court for the District of Oregon, which denied his petition for a writ of habeas corpus under 28 U.S.C.S. § 2254.

On appeal, the court found that the prisoner's taped confession was obtained by the police

page 32

by unconstitutional means based on a promise of leniency by the interrogating officers and based on the fact that the prisoner's request for counsel before making a confession was ignored. Because the confession was obtained in violation of the prisoner's Fifth Amendment rights, the prisoner's counsel was ineffective under the Sixth Amendment when he failed to file a motion to suppress the confession. The fact that the prisoner had allegedly told two other individuals about the crime did not render the error harmless because a taped confession from an accused person was much more prejudicial than the testimony of a third-party who was subject to cross-examination. Further, the error was prejudicial because, but for counsel's failure to move to suppress the prisoner's involuntary confession, there was a reasonable probability that the prisoner would not have pled to the felony murder charge but would have instead insisted on going to trial, in which case the State would undoubtedly have offered him a more favorable plea agreement.

In Czerniak, the police officers, during interrogation, the police officers told Moore ... that they "could go to bat for [him] as long as [they] got the truth," to which Moore responded: "See that's what I want to hear."

The court held that the prisoner was entitled to a writ of habeas corpus directing the State to permit him to withdraw his plea or to release him from custody. Thus, the court reversed the district court's judgment and remanded for the issuance of the writ. Moore v. Czerniak, 534 F.3d 1128, 1130, 2008 U.S. App. LEXIS 15592, *1 (9th Cir. Or. July 28, 2008)

Taking into context of the interrogation, in the case at bar, Undersheriff Sharp suggests going to bat for the defendant, and the Sharp is the defendant's lifeline as in Moore v. Czerniak.

Mr. Stenberg believes the district court's findings are unreasonable, and/or contrary to Federal Law.  In the Court's ultimate findings, the Court decided Mr. Stenberg's confession was not the product of any promises by Undersheriff Sharp that he was going to do or not do something on behalf of this defendant that he didn't do, suggesting Undersheriff Sharp carried out his promise of recommendation.

Stenberg contends his promise offers more than a mere recommendation, that it implies that the prosecutor would take a plea under the Undersheriff's recommendation...something which the undersheriff cannot do.  Therefore, Senberg contends his confession was the product of a promise by Undersheriff sharp that Stenberg would receive a plea deal [more lenient than without such a plea deal arranged by Undersheriff Sharp], if Stenberg would, "man up" according

to Undersheriff Sharp's words.

There are implied threats throughout Undersheriff Sharp's interrogation of Mr. Stenberg. Even the Court of Appeals agreed the statements made by Sharp could be construed as implicit threats for a lack of cooperation with law enforcement and that Sharp's statements were "close to the line."     "[The After reviewing the video and hearing other evidence, the district court concluded that there were numerous times when Undersheriff Sharp said that if Stenberg did not cooperate, it would go badly for him and the prosecutors may not offer a plea agreement. The court held that the statements made by Sharp could be construed as implicit threats for lack of cooperation with law enforcement and that Sharp's statements were "close to the line." However, the court ultimately held:

> "[The c]ourt finds by a preponderance of the evidence that the statement made or statements made to Undersheriff Sharp are freely and voluntarily presented. They're not the product of any coercion or undue threats. They're not the product of any promises by Undersheriff Sharp that he was going to do or not do something on behalf of this Defendant that he didn't do."

On appeal, Stenberg challenges the district court's holding as erroneous and cites State v. Swanigan, 279 Kan. 18, 106 P.3d 39 (2005), in support of the court's error. In Swanigan, our Supreme Court addressed the issue of implicit threats for both cooperation and lack of cooperation with law enforcement. Swanigan was accused of robbing a convenience store. The interrogating officers urged Swanigan to confess so they could report to the county attorney that he had "cooperated" with them. When Swanigan denied involvement in the crime, the interrogating officers threatened to tell the county attorney that Swanigan had refused to cooperate and suggested—like here—that the county attorney would reject a deal for leniency. The officers also implied that Swanigan could be charged with five robberies, rather than just one, if he did not confess. 279 Kan. at 32-33.

The Swanigan court ultimately held that "without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary." Swanigan, 279 Kan. at 33. But the Swanigan court held a higher standard of review applied with regard to an officer's threats to tell the county attorney about a defendant's lack of cooperation. The court concluded that threatening a defendant with the prospect that his or her lack of cooperation will be forwarded to the sentencing judge is inconsistent with Swanigan's

*page 34*

right to remain silent as articulated in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). 279 Kan. at 36.

"[In Miranda], the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination from the inherent pressures of the interrogation atmosphere. Included in the mechanism is a requirement for informing the suspect of the right to remain silent, accompanied by the assurance of a continuous opportunity to exercise it throughout the interrogation. [Citation omitted.]" 279 Kan. at 36.

At the end of the day, however, the Swanigan court held that a law enforcement threat to tell a charging authority about a defendant's lack of cooperation does not render a confession involuntary per se, but again is a factor for determining voluntariness that should be considered in the totality of the circumstances. 279 Kan. at 37. After considering all of the circumstances, the court found that Swanigan's confession was involuntary because there was evidence that (1) the officers repeatedly used false information and evidence; (2) the tactics used by the officers— including threats to convey Swanigan's lack of cooperation to the county attorney and threatening to charge him with additional robberies unless he confessed—were unfair; and (3) Swanigan had low intellect and susceptibility to anxiety. The court expressly noted that "any one of these factors," when considered alone, might not be sufficient to show coercion. Rather, the combination of all of these factors led the court to find the statement involuntary. 279 Kan. at 39.

Turning back to the case here, Stenberg contends several statements made by Undersheriff Sharp were impermissible under Swanigan. The video of the interview supports Stenberg's arguments, including the following statements:

"[Sharp]: When the county attorney gets these kind of cases and the evidence we currently have, they do not want to make a deal, they do not want to have any reason to have a conversation with you. And what I mean by that, and I'm not threatening you, but my conversations with them about this, is when something like this happens, and we don't get the information from the person we talk to when we know that information is there, they very much want to take this to a jury type trial. . . . When I talk to the prosecutor and he says that he wants to take this to a jury trial, and if that would happen with those two girls getting on the stand with those two girls saying what they've said, and with a taped interview, your chances are slim to none. . . .

. . . .

"[Sharp]: What I'm trying to get from you today is your cooperation. Because I'm telling you, it doesn't matter if it's a Gray County jury, a Ford County jury, the State of Kansas with conservative people we have in this state—you've lived here 10 years—if there's a five-year-old and a four-year-old go up on the stand, and they have to sit there and say, 'my dad, my stepdad did this to me,' people are going to want to have your head on a

*page 35*

platter. . . .

. . . .

"[Sharp]: I can't go to the prosecutor and help you out if you sit there and say . . . If I tell them like you don't know, you don't know, there's circumstantial this, circumstantial that. If I can't give them anything, the prosecutor is going to want to take you to court. He's not going to want to make a plea agreement. . . .

. . . .

"[Sharp]: If I go over there and tell [the county attorney] that you skirted around the issue, and you bounced around the issue and we sat here and talked and you had really no real information to give me, he's going to want to take you to jury trial. He's going to beg that you go to a jury trial because he knows that you're probably going to look at quite a bit of time at that stage, because he's going to say that you're being untruthful about it. . . .

. . . .

"[Sharp]: It's not a matter if you did or you didn't—you need to tell me what happened on your behalf. Because I really can't go to the prosecutor and tell him. . . . If you have remorse about what happened, there's a chance that things are going to be less than what they are now. Because if we have to put the girls on the stand and put them through that, he's going to request anything and everything he possibly can, plus the kitchen sink to throw at you. If you accept this that you made a mistake and you man up to things, [the county attorney] will take a plea agreement on it at my recommendation. But if he sees I'm here for two and three and four hours and you're not wanting to play ball. . . .

. . . .

"[Sharp]: You're leaving me no choice but to go into my office and draw up that criminal affidavit, and I'm not saying you're not cooperating but you're not cooperating. You've got stories and you're not telling me. . . .

. . . .

"[Sharp]: I understand from your perspective you're thinking if I confess to this then I'm screwed, but you not confessing to things that you've done is screwing you."

Like in Swanigan, Undersheriff Sharp not only suggested Stenberg would have more positive consequences if he confessed to the crimes, but suggested negative consequences if he did not confess: elimination of any opportunity to negotiate a plea agreement with the county attorney and certain conviction by a jury. Sharp's statements are inconsistent with Swanigan's right to remain silent as articulated in Miranda; therefore, we will consider the impropriety of Sharp's threats as a factor in deciding whether Stenberg's verbal and written statements were voluntary in the context of all of the circumstances presented. See Swanigan, 279 Kan. at 37.

Stenberg also contends that Undersheriff Sharp made improper promises of leniency if he confessed. For example, Sharp told him "I'm throwing you a life preserver here," and "I'm telling you the only person that can save you at least a little bit of grief is me."

"[I]n order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official;

it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believed to have the power or authority to execute it. [Citations omitted.]" State v. Harris, 284 Kan. 560, 579-80, 162 P.3d 28 (2007).

There is no evidence of any such promise or benefit made in this case. Undersheriff Sharp did not promise that a public official would perform any specific benefit for Stenberg. As the district court noted, the county attorney did make plea offers, but no deal was reached.

Stenberg argues the coercive tactics used by Undersheriff Sharp in interrogating him necessarily rendered those statements involuntary and inadmissible. But as we noted above, this court must consider the totality of the circumstances surrounding the interrogation, including findings on the other voluntariness factors: the accused's mental condition; the manner and duration of the interrogation; the accused's ability to communicate with the outside world; the accused's age, intellect, and background; and the accused's fluency with the English language. Walker, 283 Kan. at 596-97. "'The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo.'" Patterson, 304 Kan. at 274.

With regard to Stenberg's mental condition, the district court noted Stenberg had two associate degrees, spoke and understood English well, communicated and testified appropriately, and did not appear affected by low blood sugar brought on by his diabetes. As to the manner and duration of the interrogation, the court noted that the two-hour interview was not overly long, and Undersheriff Sharp did not raise his voice, but was conversational, professional, and sat close to Stenberg. The court reviewed the interview video and found no evidence bearing on Stenberg's ability to communicate with the outside world. With regard to Stenberg's age, intellect, and background, the court noted that Stenberg was in his 40s, spoke in a manner consistent with someone of average or above-average intelligence based on his educational background, and that he had knowledge of how the criminal justice system worked based on his criminal history in Kansas and California. Finally, the court found no reason to believe that Stenberg had any issue with understanding the English language. With regard to the fairness of the officer in conducting the interrogation, we note Sharp suggested on multiple occasions during the interview that there may be some sort of legal distinction between rape with an erect penis and rape with a soft penis. We also note statements by Sharp advising Stenberg that if he did not confess, the county attorney would be unwilling to negotiate a plea and he would face certain conviction at a jury

*page 37*

trial.

Although we have found for purposes of this opinion that two of the interrogation tactics employed by Undersheriff Sharp were coercive, we nevertheless find Stenberg's statements were voluntary and the product of free and independent will when considered in conjunction with all of the other circumstances surrounding the interrogation. In making this finding, we do not condone the coercive tactics used by law enforcement in this case. But when we consider the totality of the circumstances surrounding the interrogation, we are not persuaded that the unfair tactics overcame Stenberg's free will and caused his statements to be involuntary.

Our conclusion regarding the voluntary nature of Stenberg's oral and written statements is supported by the timing of Stenberg's verbal and written admissions. Assuming there is some sort of coercion, "there must be a link between the coercive conduct of the State and the confession." Swanigan, 279 Kan. at 40 (noting Swanigan changed his story shortly after officers lied to or threatened him). Here, Stenberg's confession did not immediately follow Undersheriff Sharp's inappropriate threats or misrepresentations of the law.

Finally, our conclusion is supported by the substance of the oral and written statements made by Stenberg during the interrogation. As noted by the district court, Stenberg's statements do not mirror what Undersheriff Sharp told him A.P. and K.P. alleged, but instead go beyond the details provided by Sharp. See State v. Stone, 291 Kan. 13, 29, 237 P.3d 1229 (2010) ("Stone did not volunteer facts but rather he adopted facts as they were suggested to him by the detective and as her insistence that he tell 'the truth' became more adamant."). For example, Stenberg told Sharp that when he rubbed his penis against K.P., she was lying down on the bed and he was standing at the edge of the bed. The information provided by Stenberg was not revealed by K.P. to her foster mother or to Special Agent Popejoy and, in turn, was not relayed from Sharp to Stenberg. With regard to A.P., Stenberg told Sharp about two specific instances in which he put his penis in A.P.'s mouth. Once, he woke up naked and she was in the bed next to him; he put his penis to her mouth to "see what it felt like" and she opened her mouth. Another time, A.P. walked into the bedroom while Stenberg was masturbating; when he got up to use the bathroom, he walked past A.P. and "brushed [his penis] across her lips." In contrast, A.P. only alleged that he had put his penis in her mouth.

For all of the reasons stated above, we find the district court did not err in admitting Stenberg's confession as a product of his free and independent will. State v. Stenberg, 2017 Kan.

*page 38*

App. Unpub. LEXIS 851, *25-29, 404 P.3d 356 (Kan. Ct. App. October 6, 2017)

Stenberg contends the Court of Appeals facts do not allign with those in the record. i.e. The Court of Appeals reported that "K.P. told Popejoy that Stenberg had 'put his pee-pee in [her] pee-pee,'" SEE State v. Stenberg, 404 P.ed 356 (Kan. Ct. App. October 6, 2017) ¶ 5, under the heading FACTS. However, the record indicates that K.P. told Stephanie Casanova that "Daddy John [Stenberg] put his pee-pee on [her] pee-pee." (R.9: 195). Stenberg contends that the issue is unreasonably decided on facts that do not allign with those in the record.

Further, Undersheriff Sharp's statements, clearly demonstrate that he was making promises that he could not keep. It is beyond Undersheriff Sharp's authority to offer lienancy in trade for a confession, as Undersheriff Sharp cannot fulfill such promises. The record indicates the following statement from Undersheriff Sharp, telling Mr. Stenberg that he (Sharp) is "throwing [Stenberg] a life preserver" and if he does'nt cooperate and the girls testify at trial, "people are gonna want to have your head on a platter." (R.3: 195). (a transcript of the entire interview is in Vol. 3 on pages 215-73, and the recording of the interview is in Vol. 11). It should be noted Mr. Stenberg's videotaped interrogation was not admitted--just his written statement. (R. 9. parts 1 and 2). The district court denied the motion for exams of the girls. (R. 3: 320). After hearing evidence about the interview between Sharp and Mr. Stenberg, the court concluded "this interrogation was nothing more than a normal interrogation." (R. 8: 122).

Undersheriff Sharp also misrepresented the law on the matter of the crime of rape. In attempting to elicit a confession from Mr. Stenberg, the following took place:

Sharp:      I understand that you feel that you have a great amount to lose, but without having some type of rationalization or admission of what's going on, I got to present what they're saying to the County Attorney's office.

Sharp:      I'll be honest, the way they sat there and said at one point was your penis was soft and that's when penetration occurred both orally and vaginally. So the thing is, I mean your defense on the matter, if that's the case, you aren't classically raping anybody....If your penis is hard and you are ramming it into somebody a lot of people would say that would be rape. Would you agree with me on that?

Stenberg:   A lot of people say if the penis is soft it would be the same thing.

Sharp:      But is it though? Is it the same?

...
Sharp:      It wasn't like you seduced them in the bedroom and then you forcibly raped

*page 39*

somebody to get off and ...ejaculate inside of anybody.

...

Sharp:     I understand in your mind, you're thining, I've got everything to lose on this.  But I can tell you this - and you can believe me or not - but I swear to you as I'm sitting here talking to you, everything I have and the badge I've worn for 22 some odd years, I am being honest with you.  When the County Attorney gets these kind of cases and the evidence we currently have, they do not want to make a deal, they do not want to have any reason to have a conversation with you.  And what I mean by that, and I'm not threatening you, but my conversations with them about this is when something like this happens and we don't get the information from the person we talk to, and we know what that information is there, they very much want to take this to a jury type trial.  And if that would happen in a case like this, with the information we have....When I talk to the prosecutor and he says that he wants to take this to a jury trial, and if that would happen with those two girls getting on the stand with those two girls saying what they've said, and with a taped interview, your chances are slim to none.

If you talk to me and tell me that there's a reason....But I'm throwing you a life preserver here.

...

But the basis of fact that there are things that occurred between you and the girls.  You can deny that all you want to, but on their information, it happened.  What I'm trying to get from you today is your cooperation.  Because I'm telling you, it doesn't matter if it's a Gray County jury, a Ford County jury, the State of Kansas with conservative people we have in this state - you've lived here 10 years -  if there's a five year old and four year old go up on the stand, and they have to sit there and say, "my dad, my step-dad did this to me," people are gong to want to have your head on a platter.

Sharp:     I have one side of the story, And without your side of the story, I have to go with theirs.  I don't have any other choice.  My things is not here to put you in prison for the rest of you life.  I want to know what the truth is, because the truth is the only thing that is going to take care of this matter.  I've been around the block enough to know what the other outcome is and that doen't look good for you.  So talk to me about what happened.  What lead up to this thing"  Talk to me about your contact...So will you please tell me the truth about what your contact was with the girls.

...

Sharp:     [A.P.] says that ... you peed in the bedroom, which I would take to mean masturbation, and that there's penetration with here - your soft penis, or semit-soft penis, into her vagina and that you also had put it into her mouth.

...

Sharp:     Do I have twenty counts or do I have five counts?  That's going to make a helluva difference....I'm getting back to the jury thing again.  But I want you to tell me the

*page 40*

truth. Do I understand that' it's hard for you to tell me this, absolutely. But you've go to understand that - you're going to be able to function a lot better once the deal comes up because it's one of two things. Either everbody and their brother knows about this and it comes out and it goes to a jury trial or to the judge. Or you and I talk in a room with prosecutors and it gets taken care of. How do you want to deal with it? Because right now you are leaning towards doing the jury, and if that happens the embarrassment and everything else is going to be pretty incredible.

...

Sharp:   I'm telling you the only person that can save you, at least a little bit of grief, is me. (R. IX, Appendix B, Title 2).

After a five minute break, Undersheriff Sharp returned to the room and continued the interrogation. Mr. Stenberg continued to deny that anything inappropriate had occurred. (R. IX, Appendix B, Title 2). Undersheriff continued his tactics:

Sharp:   You and I are miles apart on this, but to me when you think of a penis that is erect, if it is an erect penis, then you're thinking that it's sexual prowess, sexual power, and everthing else. But if it's not erect, then you're done. You're done masturbating, you've ejaculated.

...

Sharp:   John, you're this close to telling me what happened. I can't go to the prosecutor and help you out if you sit there and say...If I tell them like you don't know, you don't know, there's circumstantial this, circumstantial that. If I can't give them anything, the prosecutor is going to want to take you to court. He's not going to want to make a plea agreement.

...

Sharp:   I comes down to this - they are going to want to take what the girls said in the forensic interview. If [A.P.] sits there and does this number [flashes ten fingers twice], that's what they're going to what to have me charge up. If tha's an out and out liie, that this didn't happen 20 times, it happened five times, that's one of the things I need to know, need to get cleared up today.

...

Sharp:   I'm not here to trick you, not here to lie to you, not bullshitting you. I'm sitting here talking to you man to man. (R. IX, Appendix B, Title 2).

...

Sharp:   I'm not kidding you. <u>The only saving grace you have is me if we get this out in the open and we take it. The only reasonable expectation you have on a plea agreement is that.</u> Otherwise, Ive got to go and write that up - that a four year old, who was three at the time, said that you had sexual contact with her at least 20 times, that 's 20 counts. [Emphasis mine]

*page 41*

...
Sharp:      You show that to a jury -that DVD interview - and they see that and then you show, they have them up there on the stand, that's not going to work well for you. We're to the point of this -- it's not whether it happened or didn't happen, it's how many times it happened. I'm not bullshitting, that's what we're up against. You can deny, and deny, and deny, and deny, but based upon my 22 years of investigative experience...So you've got me, a detective, a Special Agent from the KBI, and DCF work all watching this going "Holy shit, that's some pretty good evidence right there." [Emphasis mine]

...
Sharp:      If I go over there and tell them that you skirted around the issue, and you bounced around the issue and we sat here and talked and you had really no real information to give me, he's going to want to take you to jury trial. He's going to beg that you go to a jury trial because he knows that you're probably going to look at quite a bit of time at that stage, because he's going to say that you're being untruthful about it.

...
Sharp:      It's not a matter if you did or didn't - you need to tell me what happened on your behalf. Cause I really can't go [to] the prosecutor and tell him...if you have remorse about what happened there's a chance that things are going to be less than what they are now. Because if we have to put the girls on the stand and put them through that, he's going to request anything and everything he possibly can, plus the kitchen sink to throw at you. If you accept this that you made a mistake and you man up to things, Giardine will take a plea agreement on it at my recommendation. But if he sees you're in here for two and three and four hours and you're not wanting to play ball... [Emphasis mine]

...
Sharp:      They are going to take this as an unwillingness once we have evidence and information that you don't want to go forward and they're going to take a hard stance on it. So, belive me or not, and I hope you do because I am being honest with you, I'm you're only saving grace. I am it. I'm it. I'm a life preserver. The boat has capsized and you're alive and breathing, but you've got to reach out. (R.IX, Appendix B. Title 3). [Emphasis mine]

...
Sharp:      If you think I'm trying to screw you because you're going to make a confession to me and I'm going to put the hammer to you, I'm not. But the thing is, I have to go off of what they tell me, I have to go off what you tell me.

...
Sharp:      The secret is out. That's the thing. The secret is out, it's done. You just need to take the next step and tell me the who, what, where, when, why, how kind of deal to it. If you don't want to, you've just got to tell me you don't want to, okay. I'll respect it either way. But then I've got to go to the computer and I've got to write this affidavit up based upon this information. It's not as if you didn't cooperate. It's up to you if you want to talk to me or not. But in stages of the investigation, this is the time I planned on talking to you. If you confess, okay great, you confess, we've got something to work with. It's out in the open. The sins or deeds or whatever you want to say are out in the open and we can deal with that and go

*page 42*

to the next phase.  If you don't want to go in that direction andyou don't want to talk to me about what happened other that these chance encounters with the girls, trying to minimize it, which that is what it is, then you give me no choice but to write it up the way the interviews went.  And the KBI agent is going to give me a report, the PD detective is going to give me a report, and then I'm going to do my own report, and based upon all that information, plus the interviews, then I've go to submit it to the CA's They know I'm doing an investigation.  (R. IX, Appendix B, Title 3).

...

Sharp:    Come down to numbers again.  This happened once, twice, three times and urges got the bettter of you, like I say you're human... The things is I would like to leave here today and if things are the way they described it, you know you don't have to write me a written confession, write the girls an apology lettter and move on.  That would do more for me, you and them, than it would writing out every single detail of the things that you did.  I mean is that not a sincere way of taking care of a problem more so than writing me out a detailed confession.

...

Sharp:    This is more than just a casual brushing up against...but there is a difference.  <u>There's a difference between taking your erect penis and ramming it into a little girl's vagina, and there's a difference than if you brushed your semi-erect penis against somebody's labia.</u>  To me there's a difference.  What a jury is going to see is when they say there's penetration, they're going to see you and they're going to see that little girl on the stand and they are going to think that you're just ramming her with your dick as hard as you can.  Because they don't see that you give into urges and he rubbed his penis up against her vagina <u>and the penetration was just ever so slight.</u>  They don't see that. They see you just ramming her as hard as you can to get sexual gratification because you don't give a shit.  That's what they see.  That's what a jury's mind sees.  (R. IX, Appendix B, Title 3). [Emphasis mine]...

Sharp:    Courtesy and respect and doing my job and talking to you.  There are probably officers out there who would not have even gone to this level to even talk to you based upon what the girls said.

...

Sharp:    Ask you one more time before I leave, are you going to talk to me about this.

...

Sharp:    You're leaving me no choice but to go into my office and draw up that criminal affidavit, and I'm not saying you're not cooperating but you're not cooperating.  You've go stories and your'e not telling me.  (R. IX, Appendix B, Title 3).

...

Sharp:    I understand from your perspective you're thinking if I confess to this then I'm screwed, but you not confessing to things that you've done is screwing you. (R. IX, Appendix B, Title 3).

After 90 minitutes of denying any inappropriate sexual contact with K.P. and A.P. und

Undersheriff Sharp repeatedly telling him that (1) brushing against the girls with a soft penis was

not the same as forcible rape, and (2) if he did not confess to something he had no chance of receiving a plea deal from the prosecutor, Mr. Stenberg finally stated that he touched them a couple of times to see what it felt like.  (R. IX, Appendix B, Title 4).  Mr. Stenberg wrote a statement indicating that he placed his soft penis against A.P.'s lips twice and that he rubbed his soft penis against K.P. once.  (R. IX, State's Exhibit 7).

Prior to trial, Mr. Stenberg's attorney filed a motion to suppress Mr. Stenberg's statement to Undersheriff Sharp, asserted that it was not voluntary due to the unfair interrogation tactices employed by Sharp.  (R. I, 49, 53-55, 187-205).  <u>The district court denied the motion, finding that Undersheriff Sharp did not misrepresent the facts or law, nor did he make any threats or promises to Mr. Stenberg to induce him to confess.</u>  (R. VI, 119-123) [Emphasis mine]

John Stenberg was tried for rape and aggravated indecent liberties with K.P., and two counts of aggravated criminal sodomy of A.P. (R. I, 308-09).  During trial, Mr. Stenberg renewed his objection to the admission of his statements to Undersheriff Sharp.  (R. VII.I, 13; VII.2, 177).  This district court overruled Mr. Stenberg's objection and granted him a continuing objection.  (R.VII.1, 13).  The jury convicted Mr. Stenberg of all four counts.  (R. VII.1, 100).  The district court sentenced him to life in prison with no possibility of parole for 25 years on all four counts, and ordered counts one and four to run consecutively to counts two and three.  (R.I, 394-405).  Mr. Stenberg appealed. (R. I, 360).

*page 44*

# CONCLUSION

**Ground One**: There is no question that Mr. Antosh extensively litigated the issue of suppressing Mr. Stenberg's statement.  The record supports that he "put a lot of woork in to prepar[e] for that hearing" -- that is a factual finding made by the court that Mr. Stenberg cannot dispute.  (R. 1: 80).  But once the court ruled that the statement could come in, it was not enought for Mr. Antosh to just stay under the radar and hpe the State messed up.

It was not an objectively reasonable strategy to hope that this Court of Appeals of the State of Kansas -- which we all know, or should know, seldom reverses a district court's decision to admit a defendant's statement to law enforcement as voluntary -- would overturn  the district court's decision to allow in a statement found to be "nothing more than a normal interrogation" where "nothing presented at hearing demonstrates the statements were not made freely, or were they a product of threats of promises" (R. 3: 317).  See, e.g., *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992) (trial court's findings "on motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court").  Although Mr. Antosh fought hard to suppress the confession, he had no plan afterwards, no strategy.  It is not strategy to hope the State makes a mistake.

**Ground Two**: The facts present clear evidence that Sharp made promises and implied threats to coerce a confession from Mr. Stenberg.  Mr. Stenberg request Habeas relief on this issue.

Mr. Antosh's trial representation constituted a breakdown in the adversarial process our system counts on to produce just results.  See *Strickland*, 466 at 696.  During cross-examination, the State asked Mr. Antosh if he was "of the opinion that your handling of the case was somehow deficient?"  (R. 2: 87).  He replied:

I don't belive it was.  I don't know.  I'm not comforatable answering that question, quite frankly.  (R. 2: 87).

Mr. Stenberg urges this Court to answer that question in the affirmative.  He asks this Court to grant Habeas Relief.